<u>AFFIDAVIT</u>

I, Stacy Fleischmann, being duly sworn, state as follows:

<u>INTRODUCTION</u>

1.      I am a Special Agent with United States Immigration and Customs Enforcement Homeland Security Investigations ("HSI") and have been so employed since 2009. I am currently assigned to the Office of the Special Agent in Charge, Boston, Massachusetts. I am authorized to investigate crimes involving violations of Title 18, Title 8, and Title 19 of the United States Code ("U.S.C."). I am a "federal law enforcement officer" as defined in Rule 41(a)(2)(C) of the Federal Rules of Criminal Procedure, that is, a government agent who is engaged in enforcing the criminal laws of the United States and within a category of officers authorized by the Attorney General to request a search warrant.

2.      I am a graduate of the Federal Law Enforcement Training Center in Glynco, Georgia, where I received training to become a federal agent. I have received certification in the Criminal Investigator Training Program and the Immigration and Customs Enforcement Special Agent Training Program. I have also received training relating to the trafficking of persons, including sex trafficking, and other offenses.

3.      Based on my training and experience, I know that individuals are trafficked for several purposes. Some of these purposes are commercial sex, involuntary servitude, peonage, debt bondage and slavery. Human trafficking is often accomplished through the use of fraud, force and coercion. I am familiar with the federal and state laws which make it a violation to engage in human trafficking, such as 18 U.S.C. §§ 1581 through 1595 (Peonage, Slavery and Trafficking in Persons), 18 U.S.C. §§ 2421 through 2428 (Transportation for Illegal Sexual Activity and Related Crimes).

4.      I have participated in investigations of sex trafficking, human trafficking, human smuggling, alien harboring, border violations, drug and firearm trafficking, and related offenses. Many of these investigations have had national or international connections, and many required me to work closely and share information and intelligence with members of other federal, state, and local law enforcement agencies. I have interviewed, and continue to interview, defendants, informants, and witnesses who have personal knowledge about human trafficking, including sex trafficking, and other crimes occurring in Massachusetts, nationally, and abroad.

## PURPOSE OF THE AFFIDAVIT

5.      I submit this affidavit to aid the Court's determination of whether Jermall ANDERSON and LATASHA Anderson be detained pending trial. ANDERSON has been charged by indictment with five counts of Sex Trafficking by Force, Fraud, or Coercion, in violation of 18 U.S.C. § 1591, and one count of Coercion and Enticement, in violation of 18 U.S.C. § 2422(a). LATASHA has been charged with two counts of Sex Trafficking by Force, Fraud, or Coercion, in violation of 18 U.S.C. § 1591.

6.      This affidavit is based on my participation on this investigation, my discussions with other agents and law enforcement officers, my interviews of numerous victims and witnesses, my review of law enforcement reports, materials gathered through subpoena and search warrants, and publicly available sources of information. This affidavit does not set forth all of my knowledge about these defendants.

## EVIDENCE IN CASE

*Investigation Background*

7.      This investigation began as a spin-off to another sex-trafficking investigation

involving defendant Barry Davis[1]. While investigating Davis, investigators learned that he and ANDERSON exchanged and shared victims for prostitution and/or transported each other's victims for the purpose of prostitution. This investigation started in 2018, but it has been difficult to find a sufficient number of victims willing to speak with investigators about their experiences with ANDERSON and LATASHA. As stated in more detail below, ANDERSON chose his victims based on their vulnerability. They were struggling from drug addiction, often being recruited directly from drug rehabilitation facilities, had no regular employment, had no steady or permanent residences, and had little or no connection to other individuals in the areas in which ANDERSON trafficked them.

8.     The evidence described below is taken from the victims' statements and sworn testimony and materials obtained via subpoena and search warrants.

*Victim 1*

9.     Recruitment: In early 2014, Victim 1 was a patient at a rehabilitation facility in Massachusetts. She was detoxing from heroin. Victim 1 had been addicted to heroin for approximately five years and had been kicked out of her prior residence before entering the facility. She was unemployed and had nowhere to live.

10.     At the facility, Victim 1 met another woman ("Woman 1") who had been prostituting for ANDERSON and serving as his "bottom."[2] Woman 1 told Victim 1 that ANDERSON could get her and Victim 1 drugs if they left the detox facility. Victim 1 agreed to

---

[1] On March 27, 2017, Barry Davis pleaded guilty to three counts of Sex Trafficking by Force, Fraud, and Coercion, in violation of 18 U.S.C. § 1591, and three counts of Transporting an Individual for the Purpose of Prostitution, in violation of 18 U.S.C. § 2421. On October 20, 2017, pursuant to a plea agreement, U.S. District Court Judge Patti Saris sentenced Davis to 216 months' imprisonment. Docket No. 16-cr-10133-PBS.

[2] A "bottom" is usually a woman who is also engaged in prostitution but has some management responsibilities for the trafficker's prostitution activities, such as booking hotels, posting advertisements, doling out drugs, collecting and keeping track of money, driving victims to hotels, all on behalf of the trafficker.

leave with Woman 1 before Victim 1's treatment was complete.  Woman 1 called someone, and an unknown female drove them both to a hotel in Waltham.  There was one other female in the hotel room actively doing prostitution dates in the hotel room.

11.    ANDERSON arrived at the hotel.  He told Victim 1 that she could make money and stay in hotel rooms if she prostituted for him.  Victim 1 knew that ANDERSON was a pimp and understood that to continue to have a place to stay, she would need to prostitute for ANDERSON.  During that initial meeting, ANDERSON provided Victim 1 with heroin.  After the fact, Woman 1 admitted to Victim 1 that she had been at the detox facility specifically to recruit women for ANDERSON.

12.    Victim 1 also admitted that while she was prostituting for him, ANDERSON enlisted her to recruit additional women from detox facilities, just as Victim 1 had been recruited by Woman 1.  ANDERSON instructed her to "find other women" and sent her to detox facilities approximately three times.  Victim 1 stated that she was not successful in recruiting additional victims.  To find new victims, ANDERSON also searched Backpage.com ("Backpage"),[3] went to strip clubs, and used his network of drug dealers.  Victim 1 stated that ANDERSON always looked for "vulnerable" victims, meaning homeless women with drug addiction struggles.  Victim 1 stated that ANDERSON also sent other women, including charged co-defendant Jennifer FORTIER, to detox facilities to recruit additional victims.

13.    <u>Prostitution / Money</u>: After that first meeting, ANDERSON posted an advertisement for Victim 1 on Backpage.  ANDERSON posted ads using aliases and photos of women he found on the internet, both common practices for prostitution advertisements.

---

[3] Backpage.com was a website commonly used to advertise prostitution services.  It was shut down and its servers seized by the FBI in April 2018.

ANDERSON paid for the ads.  Victim 1 informed investigators that ANDERSON posted the advertisements linked to the phone number 774-219-6663 (the "6663 Number").  Investigators obtained and reviewed at least 100 pages of Backpage advertisements listing the 6663 Number. Numerous advertisements contained photos of a red-headed woman wearing a camouflage crop top, which was the same photo Victim 1 described.  Those advertisements were purchased by an account holder with the email address of Mackmall197923@outlook.com.  Investigators confirmed that ANDERSON, a/k/a "Mal" was the a regular user of that email account, described in greater detail below.

14.    Victim 1 prostituted for ANDERSON for about six months during this initial period.  Victim 1 was hospitalized, and when she was discharged, neither ANDERSON nor any of his associates would pick her up.  She prostituted for another pimp she identified as "Riz,"[4] and then for Barry Davis.  Victim 1 had met Davis while prostituting for ANDERSON because both Davis and ANDERSON brought their victims to the same hotels to prostitute. Victim 1 then left Davis by entering a domestic violence shelter.  After some time, she started prostituting again for ANDERSON, and did so for approximately one more year.

15.    During the periods in which Victim 1 prostituted for ANDERSON, she prostituted in New Hampshire, Massachusetts, Rhode Island, Connecticut, New Jersey, New York, and Pennsylvania.  Victim 1 often booked the hotels with a hotels.com account or with vanilla cash cards or credit cards that ANDERSON gave her.  Victim 1 had a driver's license, whereas most of the other women did not, so she often drove herself and other women to hotels.  She rented cars

---

[4] "Riz" was identified as sex trafficker Ronald Hall.  He was indicted and convicted in November 2022 in D. Mass. and sentenced to 18 years in prison.  20-cr-10255-IT.

using the bank card for the account ANDERSON made her open (described below). Through subpoena, investigators obtained two Hertz car rental records from 2014 in Victim 1's name.

16.    During prostitution dates, Victim 1 was required to ask the customers to provide cash up front. ANDERSON set the prices: $120 / half hour; $200 / hour. Victim 1 checked in with ANDERSON by cell phone before and after each date. Sometimes, ANDERSON required her to send photos of the money to double check the amount. At first, ANDERSON required Victim 1 to pay him $300 per day, which ANDERSON stated was for the cost of ads and his "protection." Victim 1 was required to pay for hotel rooms, food, and drugs. However, that arrangement changed several months later. ANDERSON began taking all of her money and providing her with cash cards to pay for hotels and food. All the money came from prostitution. Victim 1 did not ever see ANDERSON engage in any legitimate form of work and never heard him describe any way of making money besides prostituting women. ANDERSON also required her to open a bank account in case he wanted her to deposit money she earned. Bank records obtained by subpoena show that Victim 1 opened an account with TD Bank in New Hampshire in February 2014. ANDERSON had access to the bank account but is not listed on the account paperwork. ANDERSON controlled all of the money. If he believed that Victim 1 or the other women were hiding money, he would withhold drugs from them (described below).

17.    <u>Drugs as Reward / Punishment</u>: During the time Victim 1 was prostituting for ANDERSON, she was using approximately two to three grams of heroin per day along with other drugs, cocaine, crack, and various pills. ANDERSON controlled the drug allotment and doled out two grams per day. Victim 1 stated that it was not enough, and she would regularly suffer withdrawal symptoms. If Victim 1 made more money, ANDERSON would provide additional heroin servings. If she did not make enough money, ANDERSON would withhold drugs and

Victim 1 would go through withdrawal symptoms. ANDERSON witnessed Victim 1 go through withdrawal symptoms. ANDERSON also withheld drugs if Victim 1 failed to answer her phone for him or a customer or for talking back to him. Victim 1 witnessed ANDERSON withhold or provide drugs as punishment and reward to other women working as prostitutes for him. ANDERSON either physically provided drugs to the women, had one of his associates or bottoms do it, or would hide drugs in various places at hotels at which the women were working. After a date, ANDERSON would reveal the hiding location to Victim 1 or other women so they could get the dose and use the drugs.

18.    Violence / Intimidation: Victim 1 stated that ANDERSON threw something at her and backhanded her because she had used pills and he did not want her to. He also pushed her several times, also because she was using pills. Victim 1 stated that when she used pills, she was not "put together" enough at the hotels and ANDERSON worried someone would call the police. Victim 1 also recalled ANDERSON throwing things at other women because they did not make enough money.

19.    Victim 1 stated that she had seen ANDERSON carrying a gun several times and stated that ANDERSON kept the gun in his apartment in Dracut, Massachusetts. At some point, ANDERSON got Victim 1 and the other women an apartment in Dracut. TD Bank records indicate that one of ANDERSON's bottoms ("Woman 2") opened an account in December 2015, with an address 15 Wildwood Street, Apartment #10, Dracut, Massachusetts. Multiple Uber records in the various email accounts searched during this investigation show trips back to this apartment. The women prostituted out of this apartment.

20.    At one point, Victim 1 was prostituting with another woman ("Woman 3"), and Woman 3 became very ill. Victim 1 begged ANDERSON and Woman 2 to come get Woman 3

and take her to the hospital. ANDERSON said no and stated that Woman 3 was merely "dope sick," or withdrawing from heroin and continued posting ads on Backpage for her. After about a week in which ANDERSON continued to make Woman 3 prostitute, Woman 2 came to pick up Victim 1 and Woman 3 and take them to another hotel. Woman 2 saw how sick Woman 3 was and took her to Lowell General Hospital, where she was admitted in August 2015. Medical records obtained by subpoena confirm the admission and diagnosis of several severe infections resulting in a multi-day hospital stay. Woman 3 later died from this infection.

21.    Victim 1 also identified several other women who prostituted for ANDERSON during the time Victim 1 was trafficked, including Victim 2 (described below).

22.    <u>Co-Conspirators</u>: ANDERSON enlisted additional associates to help traffic the women. Woman 2 acted as ANDERSON's bottom while Victim 1 was with ANDERSON, meaning that Woman 2 did prostitute for ANDERSON, but also had managerial responsibilities for the other women. Woman 2 did not personally use drugs, so ANDERSON trusted her to dole out drug servings to Victim 1 and the other women. ANDERSON often was not physically present in the hotel rooms where Victim 1 and the other women stayed and prostituted. He relied on Woman 2 and others to dole out drugs and collect money. Victim 1 also identified FORTIER and described her role driving women to hotels, picking up money for ANDERSON, and doling out drugs. Victim 1 stated that FORTIER did not prostitute for ANDERSON. Victim 1 described them as "partners" or "business associates."

<em>Victim 2</em>

23.    <u>Recruitment</u>: In 2015, Victim 2 was a patient at a drug rehabilitation center in Massachusetts. While there, she met Victim 1. When Victim 2 left the treatment center, she started prostituting for Barry Davis, who she referred to as "B." Victim 2 thought Davis may have

8

been ANDERSON's cousin or brother.  When she started prostituting for Davis, Victim 2 was homeless and had no job.  She was also addicted to heroin and using regularly.  Victim 2 wanted to stop working for Davis, so she spoke to ANDERSON over the phone.  She had met ANDERSON previously in person.  Since ANDERSON and Davis often shared prostitutes and sent their prostitutes to the same hotel, she was able to speak with women working for ANDERSON and get in touch with ANDERSON.  The first night she spoke to ANDERSON and agreed to work with him, she met another prostitute, believed to be Woman 3.

24.    Victim 2 was worried Davis would retaliate against her, but ANDERSON told her not to worry, that ANDERSON and Davis "traded girls before," so it was fine.  Victim 2 received some heroin from the other women in the hotel room.  The women in the room posted an advertisement for Victim 2 on Backpage or Craigslist and she had at least two prostitution dates that first night for $200 per customer.  Victim 2 gave all the money she made to one of the women in the room with the understanding that the woman would give the money to ANDERSON.

25.    Prostitution / Money: Victim 2 started to regularly prostitute for ANDERSON in different hotels in Massachusetts, Rhode Island, and Connecticut.  The women usually drove rental cars.  Victim 2 had a license, so she often drove herself and other women to the hotels.  Sometimes, ANDERSON was with them at the hotels, but often he was not.  They were responsible for checking in with ANDERSON by phone to explain how many dates they had and how much money they made.  Victim 2 had a cell phone that she purchased with ANDERSON.  She

thought ANDERSON was monitoring her phone, so she did not use it to call any friends or family. Sometimes ANDERSON would have one of the other women search Victim 2's phone.

26.    ANDERSON coached Victim 2 on how to answer the phone for prostitution customers.  ANDERSON told her to always ask if the person was "a cop."  ANDERSON set all the prices.

27.    During her time with ANDERSON, Victim 2 either prostituted or drove other women to prostitution dates every night.  ANDERSON posted the ads on Backpage for Victim 2. ANDERSON set the prices and she was expected to make $600 per night and would get angry if she did not make at least $200.  After the dates, Victim 2 gave all the money to ANDERSON's bottom to hold.  ANDERSON would stop by and pick up the money personally, or another woman, believed to be ANDERSON's cousin LATASHA, would drive the money to ANDERSON.  Victim 2 did not keep any of the money she earned.  If she needed food or something personal, she had to ask ANDERSON's permission.  ANDERSON always kept track of how much money each woman earned and knew if a woman was hiding some money from her dates based on how many prostitution dates the woman had.

28.    <u>Violence / Intimidation</u>: If a woman broke one of ANDERSON's rules or withheld money, he would strand them or threaten them.  At one point, Victim 2 felt threatened by another woman and said she was going to call the police.  Because of that, the women left her stranded at a hotel.  When Victim 2 called ANDERSON, ANDERSON told her that because she threatened to call the police, the other women had left her.  ANDERSON told her that if she could make her own way back to his apartment in Lowell, then she could keep working for him.  Victim 2 called a man she knew and got him to bring her to Lowell.  When she arrived, Victim 1 and Woman 2

were at the Lowell apartment. Victim 2 said that Vicim 1 and Woman 2 frequently prostituted out of that location.

29.    Victim 2 identified LATASHA's photograph as "ANDERSON's cousin." She stated that LATASHA would "reinforce things" and drive the women around, but she never prostituted for ANDERSON. LATASHA was aggressive, and Victim 2 was afraid of her. The other women told Victim 2 that LATASHA had beat them before. Victim 2 heard LATASHA on the phone telling ANDERSON when the women complained or failed to collect money from a prostitution customer. Victim 2 also identified two other men, not by name, but identified photos in her interview. These men came and collected money, doled out drugs, and were violent towards the women.

30.    Victim 2 saw one of the men ("Man 1") hit one of the women because she was hiding money. ANDERSON often sent Man 1 to monitor the women, make sure they were paying all the money for their prostitution dates. Victim 2 was scared of Man 1 because he hit women to make an example of them.

31.    While Victim 2 was prostituting for ANDERSON, Woman 3 (described above) was also prostituting for him. Victim 2 described seeing Woman 3 get sick and beg to go to the hospital. ANDERSON refused to take her to the hospital and said Woman 3 was just "dope sick" and faking it. ANDERSON also told Victim 2 that she was not allowed to drive Woman 3 to the hospital. Eventually, ANDERSON told Victim 2 to take Woman 3 to the hospital. ANDERSON later told Victim 2 that Woman 3 had died in the hospital. Victim 1 confirmed this narrative about Woman 3 (described above). After hearing Woman 3 had died, Victim 2 got scared and tried to escape

from ANDERSON with a prostitution customer, but the customer ended up being very scary and had a gun, so she went back to ANDERSON.

32.    Victim 2 stated that she never personally saw ANDERSON use physical violence on anyone.  She saw ANDERSON threaten violence, the withholding of drugs, and threaten to leave women behind, like he left Victim 2 at one point.  ANDERSON made these threats when women did not make enough money or did not answer their phones for prostitution dates.  Victim 2 was constantly scared of not receiving her heroin.  ANDERSON also created a climate of fear where women felt they had to tell ANDERSON if other women were not answering prostitution calls or withholding money or otherwise breaking ANDERSON's rules.

33.    <u>Drugs as Reward / Punishment</u>: Victim 2 was using heroin while she was prostituting for ANDERSON.  Her sources of drugs were ANDERSON, Man 1, or one of the other women who was also prostituting.  If Victim 2 failed to make enough money, ANDERSON withheld the heroin.  If she made more money than expected, she was given additional heroin.  She was terrified of not receiving heroin and her addiction got worse during the time she prostituted for ANDERSON.  Victim 2 described the painful withdrawals and said sometimes she was so desperate that she would send videos of pictures to ANDERSON of her withdrawing in hopes of getting more heroin.  Victim 2 showed investigators a photo from her cell phone, which investigators preserved, of a woman slumped over in a car.  Victim 2 stated that she sent this photo to ANDERSON to try to convince him to give them more drugs so they would not be dope sick.  Victim 2 also stated that LATASHA would come in the mornings to collect money and see the women withdrawing every day before they had their heroin.

34.    Eventually, ANDERSON brought some new women to prostitute that Victim 2 described as "younger."  Victim 2 was still scared about Woman 3's death and just ran out of the

hotel. She got a ride from another man she had lived with prior to working for ANDERSON and escaped.

*Victim 3*

35.    Recruitment: Prior to meeting ANDERSON, Victim 3 was homeless and staying in at a motel in New Hampshire. She was unemployed and using heroin every day. She met a man who took Victim 3 to his house. At the house, she met ANDERSON. ANDERSON told Victim 3 that he would take care of her, which she thought meant help her pay for an apartment, food, and clothes.

36.    ANDERSON put Victim 3 in his car and drove her to a house in Dracut, Massachusetts. Victim 3 stated that it was Woman 2's house. At the house, Woman 2, who served as a bottom for ANDERSON, explained to Victim 3 that she would be taking Victim 3 around to prostitute for her and ANDERSON.

37.    Prostitution / Money: Woman 2 and LATASHA drove Victim 3 to hotels to work as a prostitute. Victim 3 could not recall prostituting outside of Massachusetts. Victim 3 stated that ANDERSON gave Woman 2 and LATASHA money to pay for hotel rooms. Woman 2 and LATASHA set up profiles and advertisements for Victim 3 to start doing prostitution dates. Victim 3 stated that they used Backpage and Eros.com ("Eros")[5] to advertise. However, she does not recall actually seeing the advertisements themselves. In one of ANDERSON's email accounts, investigators found a photo of Victim 3 holding up a sign with a date and "Eros Guide" written on the sign. Victim 3 explained that Eros required the photo to ensure she was a real person before they would set up an account. Victim 3 stated that Woman 2 took the photo of Victim 3. Victim 3 had a flip phone that ANDERSON purchased for Victim 3. Victim 3 stated that ANDERSON,

---

[5] Eros is a foreign-based website that is frequently used to advertise for prostitution services.

Woman 2, and LATASHA looked at the contents of the phone regularly, i.e. checked Victim 3's call log and text messages.

38.     When Victim 3 got to a hotel room, she simply waited for customers to arrive. Woman 2 and LATASHA arranged all the dates.  Victim 3 could not remember how much money she made per date, but she gave all the money to Woman 2 and LATASHA.  She was not allowed to keep any money for herself.  If she needed anything personal, she had to ask permission. ANDERSON set the prices for the dates.  Victim 3 recalled there was a certain amount of money she needed to make each night but could not recall the exact dollar figure.

39.     <u>Violence / Intimidation</u>: LATASHA threatened Victim 3.  LATASHA never had to prostitute, but Woman 2 did.  ANDERSON outsourced most of the driving, posting ads, and money collection to LATASHA and Woman 2.  Victim 3 said that ANDERSON would always choose the areas they would stay in, but then leave Victim 3 and other women with LATASHA or Woman 2. ANDERSON would occasionally come to a hotel room to personally collect money, but mostly, LATASHA or Woman 2 brought the money to him.  LATASHA often threatened Victim 3. LATASHA told Victim 3, "if you try anything, we'll come and we'll find you."  Victim 3 described being very scared of LATASHA.

40.     Victim 3 was never allowed to refuse prostitution dates.  She was scared of ANDERSON.  She said ANDERSON would throw her around and hold her up against the wall and threaten her.  ANDERSON told her things like "You belong to me" and "If you try anything, I'll kill you."  Victim 3 said that ANDERSON did not hit her because he did not want to leave any marks.  Victim 3 said that she blocked so much of her experience out of her memory, but she does

remember seeing him threaten Woman 2 at one point. Victim 3 was scared of "what he would do to [her]" if she tried to leave ANDERSON.

41.    Drugs as Reward / Punishment: Victim 3 was using heroin regularly during the time she prostituted for ANDERSON. She received it in doses from Woman 2 and LATASHA. They would give Victim 3 the heroin in small doses in the morning and throughout the day after prostitution dates. Victim 3 stated that she usually received the heroin she needed because Woman 2 and LATASHA wanted her sedated.

42.    Victim 3 was eventually able to escape from ANDERSON. ANDERSON had left Victim 3 and the other women with two men because ANDERSON was worried he was being investigated by law enforcement and said he was going to Florida.

### *Victim 4*

43.    Recruitment: Prior to meeting ANDERSON and FORTIER, Victim 4 was struggling with drug addiction and using heroin, crack, and pills on a daily basis. She was fired from her job and was essentially couch surfing – living with different friends for short periods of time. Victim 4 was with Victim 5, who knew ANDERSON, and ANDERSON told them that if they drove FORTIER to Connecticut, FORTIER could get them drugs.

44.    Interstate Transport to Connecticut and New York: FORTIER showed up to the place where Victims 4 and 5 were staying and Victim 4 agreed to drive them to Connecticut and New York City. Victim 4, Victim 5, and FORTIER then drove to New York, but stopped in Connecticut for several weeks. ANDERSON did not go on this trip.

45.    At the hotel in New Haven, FORTIER posted Victims 4 and 5 on Backpage for prostitution dates. Victim 5 had several dates and gave all of her money to FORTIER. Two customers showed up for Victim 4, but then walked out due to Victim 4's age and her appearance

being very different than the picture used for her Backpage advertisement. During this period, they were all using drugs together, mostly heroin.

46.    Eventually, Victim 4 started doing prostitution dates for FORTIER. FORTIER told Victim 4 that FORTIER had an empty hotel room because another woman had walked out on her. Victim 4 went to the hotel with the understanding that she would be doing prostitution dates.

47.    <u>Prostitution / Money</u>: FORTIER began regularly posting Victim 4 on Backpage. Fortier would stay in the hotel room with Victim 4 and then leave when the customers arrived. All the money Victim 4 made she gave to FORTIER. FORTIER set the prices: $150 per half hour and $250 per hour. Victim 4 conducted prostitution dates in Massachusetts, Connecticut, Vermont, and Rhode Island, always out of hotel rooms that FORTIER paid for. During her time with FORTIER, other women were also working as prostitutes.

48.    Although during this period of time prostituting, Victim 4 was most often with FORTIER, Victim 4 recalled hearing FORTIER and ANDERSON arguing over the phone. She believes FORTIER was paying ANDERSON some of the money she and the other women made.

49.    <u>Drugs as Reward / Punishment</u>: During the time that Victim 4 was prostituting for FORTIER, FORTIER was her sole source of heroin and cocaine. If Victim 4 failed to make enough money, FORTIER withheld drugs from her. Victim 4 described the terrible pain she experienced going through withdrawals. FORTIER often saw Victim 4 go through painful withdrawals and would sometimes snort heroin in front of Victim 4 while she was withdrawing.

50.    <u>Violence / Other Coercion</u>: FORTIER also controlled the money for food and would withhold food from Victim 4 if she failed to make enough money. Victim 4 described one instance where FORTIER punched Victim 4 for standing up for herself. Sometimes, when FORTIER would withhold food or drugs, Victim 4 and the other women working as prostitutes

would band together and agree to provide extra "services" to the customers to make additional money on the side to purchase food and drugs. Often, these extra services meant letting the customers have sex with them without wearing condoms. The women would hide this money from FORTIER and use it to buy food and drugs.

51.     Additionally, at one point, Victim 4 had an abscessed tooth which caused her extreme pain and swelling. FORTIER made her continue taking prostitution dates and would not let her see a doctor. Eventually FORTIER bought a few antibiotic pills from a drug dealer and gave them to Victim 4.

52.     Transition back to ANDERSON: Victim 4 stated that she was prostituting for FORTIER for about six months, and she had almost no contact with ANDERSON during that time. After about six months, ANDERSON physically showed up at one of the hotels they were staying at and took Victim 4 away. Victim 4 believes that ANDERSON effectively "saved" her from FORTIER and took her away due to FORTIER's abuse. Victim 4 said that ANDERSON found out "she was making a good amount of money," and that is why ANDERSON took her away from FORTIER.

53.     ANDERSON took her to another hotel and Woman 2 was there. ANDERSON told Victim 4 to connect with a drug dealer to "get right" because she was dope sick. She was using about 10 grams of heroin per day at that point. Victim 4 stayed with Woman 2, who took care of her. Victim 4 described the period as a "rest period."

54.     Victim 4 eventually started prostituting again for ANDERSON with one of ANDERSON's bottoms. Victim 4 started paying ANDERSON $200 per day, often by giving the money she made directly to his bottom. If Victim 4 could not pay the $200, her debt simply accrued. Victim 4 believed the money was for the hotel rooms and for prostitution postings.

During this period, ANDERSON did not stay at the hotels but did stop by on a regular basis to check on operations and pick up the money. During those times, Victim 4 personally handed ANDERSON money and witnessed other women doing so. Although she stated that ANDERSON never threatened her, she did not feel like she had the freedom to turn down prostitution dates when they were arranged by the bottom.

55.    At different points, FORTIER would show back up and Victim 4 would go and prostitute for FORTIER, then return to ANDERSON. Victim 4 was not sure if FORTIER and ANDERSON were partners or competitors, but she stated that it was common for her to go back and forth and there were never any threats made between ANDERSON and FORTIER. Based on this account, investigators believe that ANDERSON and FORTIER were partners rather than competitors.

*Victim 5*

56.    <u>Recruitment</u>: In approximately 2012, Victim 5 had become addicted to crack cocaine, Percocets, and oxycontin and was living with Victim 4. Victim 5 became desperate for drugs and contacted ANDERSON, who she had met previously through a mutual friend, and requested drugs. Victims 4 and 5 had no money and were out of drugs, so Victim 5 called ANDERSON. ANDERSON told Victim 5 that if they gave "his girl" a ride, then he would make sure they were all set with drugs. The "girl" ended up being FORTIER.

57.    <u>Interstate Transport to Connecticut</u>:   FORTIER arrived at the place Victims 4 and 5 were staying and Victim 4 agreed to drive them all to Connecticut. Prior to this interaction, either Victim 4, nor Victim 5 had met FORTIER. Victims 4 and 5 thought they would only be gone for one day and did not pack clothes or toiletries. FORTIER told Victims 4 and 5 that "her girl got arrested in Connecticut" and that FORTIER needed the ride to go bail her "girl" out and

get the vehicle from the impound lot.  Victims 4 and 5 asked FORTIER about the drugs and FORTIER told them that they would stop at a wealthy drug dealer's house in Connecticut.  While driving through Massachusetts, FORTIER directed them to a drug dealer's house.  FORTIER went inside and got heroin for Victim 4.  After driving out of Massachusetts, in Connecticut, FORTIER directed them to another person's house and Victim 5 received crack cocaine.

58.    The next day, FORTIER directed Victims 4 and 5 to a hotel (still in Connecticut).  At the hotel, there were numerous other women in the hotel room.  It was clear to Victim 5 that FORTIER was the boss because all the women were asking FORTIER questions and requesting FORTIER provide them with condoms and wipes.  FORTIER also had drugs with her and began doling them out to the different women, deciding which women got either heroin or crack and how much.  The women were all dressing in various lingerie outfits and getting ready for prostitution dates.  Victim 5 stated that it was clear all the women were working as prostitutes.  FORTIER told Victim 5 that she had "more girls arriving soon."  FORTIER also gave Victims 4 and 5 drugs in this hotel room.  The next day, FORTIER brought Victims 4 and 5 to a different hotel room in Connecticut.

59.    <u>Prostitution / Money</u>: Victim 5 began regularly prostituting for FORTIER and ANDERSON.  At the beginning, Victim 5 did not want to prostitute, but ANDERSON told her that she needed to work to pay for the hotel room and the drugs.  Victim 5 was in Connecticut, had never been to Connecticut before, had no money and no vehicle, and did not think she could leave.  According to Victim 5, although ANDERSON was not present, Victim 5 heard FORTIER on the phone with ANDERSON regularly.  In those calls, they frequently discussed the logistics of their prostitution operations – women, hotels, prices.  FORTIER frequently told Victim 5 that "Mal said this…" when telling Victim 5 and the other women what to do.  FORTIER explained to Victim 5

how the prostitution operation worked.  FORTIER taught Victim 5 how to answer the phone when customers called, how to call the payment a "donation," and how to attempt to determine whether the customer was an undercover police officer.

60.    ANDERSON set the mandatory quota for how much the women were supposed to earn each day.  Victim 5 stated that ANDERSON told her that the women needed to make enough to pay for the room and their drugs.  FORTIER posted many of the prostitution advertisements and ANDERSON did some of the advertisements.  Victim 5 stated that most of the advertisements were posted on Backpage.  Victim 5 always had to pay FORTIER the money she made to cover the hotel room, the drugs, and FORTIER and ANDERSON's cut.  After those payments, she rarely had any money left.  If she did have any money left it was usually less than $100.  Victim 5 stated that she would stay up for long stretches of time and was required to do back-to-back prostitution dates, sometimes as many as 20 dates in one day.  FORTIER kept track of how many dates the women had so that FORTIER could make sure they paid her the correct amount of money.  Victim 5 stated that one of FORTIER's most important jobs was keeping an eye on ANDERSON's money.

61.    Victim 5 stated that some of the hotels warned FORTIER if the police were coming. Victim 5 stated that ANDERSON told them if they were ever arrested, they would have to tell law enforcement, "you're here with friends."  Although Victim 5 tried to stay with Victim 4, FORTIER eventually drove Victim 5 and some other women to a different hotel where ANDERSON was located, and Victim 5 began prostituting out of there.  Victim 5 stated that she prostituted in Connecticut, Massachusetts, and New York.  They mostly did in-calls at the hotels and some out-calls by the colleges and went to a few of the customers' houses.  Victim 5 was not permitted to refuse prostitution dates arranged by FORTIER or to choose not to answer the phone when

customers called. Victim 5 stated that she prostituted for FORTIER and ANDERSON for four to six months. Eventually, she was able to leave by calling a man she met on her first night in Connecticut. That man helped Victim 5 leave FORTIER and ANDERSON.

62.    <u>Violence / Drugs / Other Coercion:</u> Victim 5 stated that her personal phone was taken at some point and that she and other women used one phone. Victim 5 stated that if you did not make enough money then you would not get drugs and you would "get the shit beat out of you." Victim 5 stated that there was time when FORTIER grabbed her shirt and her throat and threw her against the wall because FORTIER thought that she was hiding money. Victim 5 stated that she could not get enough money to eat. Victim 5 witnessed FORTIER "beat the living crap" out of a woman who she accused of withholding money.

63.    When ANDERSON showed up personally at the hotels, he was there to enforce the rules. Victim 5 described on instance where ANDERSON showed up at a hotel because she had been standing up for herself with FORTIER. ANDERSON grabbed her throat, pushed her up against the wall, and told her that she better "not let this happen again" and that she "better make his money." Victim 5 was terrified and could not breathe. Other women witnessed this assault and Victim 5 remembered them pleading with ANDERSON to "Let her go. Let her go."

64.    Victim 5 recalled another instance where FORTIER took her to a hotel and ANDERSON arrived. Victim 5 witnessed ANDERSON grab one of the women and put her in a choke hold and yell at her. Victim 5 was terrified when she witnessed this assault.

65.    Victim 5 described another instance where ANDERSON showed up at a hotel and was screaming and yelling at the women. He grabbed one of the women and Victim 5 tried to intervene. ANDERSON turned and grabbed Victim 5 and punched her in the face. She lost consciousness and came to with the other women standing around her.

66.     Victim 5 stated that she believed ANDERSON carried a gun.  She saw ANDERSON "threaten girls" with the fact that he had a gun.  Victim 5 stated that she and the other women would talk about ANDERSON and their feelings about him, specifically that "a lot of us were just completely terrified of him."

67.     Victim 5 also stated that if she did not make enough money, ANDERSON and FORTIER would withhold her drugs.  During the time she was prostituting for ANDERSON and FORTIER she was addicted to crack cocaine and using it ever day.  Victim 5 stated that she "couldn't live without it."

*Evidence From ANDERSON's Email Account*

68.     As described above in paragraph 13, Victim 1 informed investigators that ANDERSON posted the prostitution advertisements linked to the 6663 Number.  Those advertisements were purchased by an account holder with the email address of Mackmall197923@outlook.com.

69.     Investigators obtained a warrant to search the mackmall197923 email account.  In addition to the email name itself ("Mal" being a nickname commonly used by ANDERSON), there are emails to "Jamal Anderson" and "Jermall Anderson" from credit card companies, credit reporting agencies, and Facebook (among others).

70.     Investigators also found the following evidence in the email account:

   a.   A photo of Victim 3 described above, showing her holding a sign for Eros, a website that hosts prostitution ads.  A photo of her driver's license which she testified Eros also required to open an account.

   b.   Like the Eros photo of Victim 3, there is an email from FORTIER's account (jen40r@gmail.com) which contained an image of an unidentified blonde female holding a sign that stated, "EROS-Guide [NAME REDACTED]" from 2014. Based on the background, it appears this photograph was taken in a hotel room.

   c.   There is an October 15, 2014, email from Woman 2's email account which contained four images of the front and back of a Santander Mastercard and the front

and back of a Massachusetts Identification card belonging to [NAME REDACTED], the likely victim described above.

d. There is a November 6, 2014 email from FORTIER's email account (jen40r@gmail.com) with a photo of a CVS receipt from Meridian, Connecticut, which shows the purchase of two cash cards, $500 and $260.

e. There is a November 7, 2014, email from FORTIER's email account (jen40r@gmail.com) which contained an image of a Vanilla credit card with the amount "$500" written on the front. Numerous victims testified that ANDERSON and his bottoms often required them to purchase these Vanilla cards with cash earned from prostitution as a method of transferring the money to ANDERSON when he was not present at the hotels with them.

  i. There are several other Vanilla card screenshots from FORTIER's email address, in which a hand appears to be holding the card.

f. There is an email addressed to this account on January 12, 2015, in which the email addresses "Latasha Anderson," from the Residence Inn in Danvers, Massachusetts and describes a January 6, 2015 reservation.

g. There is an email from Avis Rental Car from November 12, 2015 addressed to "Latasha Anderson" for an October 1, 2015 rental which had been returned as of November 1, 2015.

  i. There are additional car rental emails with agreements booked under the name "Latasha Anderson."

h. There are numerous emails to/from this account with Backpage or customers responding to Backpage advertisements.

i. There were hundreds of emails sent to this account containing images of females either nude or in lingerie consistent with photos for Backpage advertisements. The victims testified that ANDERSON used photos from the internet for their Backpage advertisements.

j. There is a 2015 email to this account Red Roof Inn showing an August 5-6, 2015 stay in Edison, Jersey booked under Victim 2's name.

*Recent Evidence of Continuing Trafficking Activities*

71.    Investigators believe that ANDERSON continued his sex-trafficking activities after the time period charged in the Indictment. Through subpoenas to financial institutions used by ANDERSON, investigators learned that he made multiple payments to Eros from his bank account throughout 2020. ANDERSON'S bank records show that after initially using his bank account to

make direct transfers to Eros, he began using prepaid debit cards from Greendot. Based on my experience and training, I know Greendot is a method of payment, much like Vanilla credit cards, commonly used to conceal financial transactions to purchase advertisements for prostitution. Investigators believe these payments were for advertisements for his sex-trafficking victims in support of his illegal activities.

CONCLUSION

72.    This affidavit sets out some of the evidence we have gathered supporting the criminal charges against Jermall ANDERSON and LATASHA Anderson. I respectfully submit it to aid the Court's determination of whether these defendants should be detained pending trial.


Signed under the pains and penalties of perjury this 10th day of August 2023.


STACY FLEISCHMANN
Special Agent
Homeland Security Investigations